CONCERNED PARENTS & CITIZENS FOR the CONTINUING EDUCATION AT MALCOLM X (PS 79) et al., Plaintiffs-Appellees,

v.

The NEW YORK CITY BOARD OF EDUCATION; Frank J. Macchiarola, Individually and as Chancellor of the New York City Board of Education, et al., Defendants-Appellants.

No. 1263, Docket 80–7300.

United States Court of Appeals, Second Circuit.

Argued May 30, 1980.

Decided July 8, 1980.

Carol R. Abramson, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, L. Kevin Sheridan, Judith A. Levitt, Jane Hovde, Asst. Corp. Counsel, New York City, of counsel), for defendants-appellants.

James C. Francis IV, The Legal Aid Society, Civil Appeals & Law Reform Unit, New York City (John E. Kirklin, Director of Litigation, The Legal Aid Society, Civil Appeals & Law Reform Unit, New York City, Kalman Finkel, Atty.-in-Charge, The Legal Aid Society, Civil Division, New York City, of counsel, Andrea Mintz, New York City, on the brief), for plaintiffs-appellees.

Before FEINBERG, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

FEINBERG, Chief Judge:

This case involves the interpretation of the Education for All Handicapped Children Act of 1975, one of the many recent congressional enactments that bring new and complex questions into the federal courts. The New York City Board of Education and various Board officials and trustees (hereafter collectively referred to as the Board) appeal from an order entered in the United States District Court for the Southern District of New York, Robert L. Carter, J., holding that the Board had violated the Act by transferring approximately 185 handicapped children from Public School 79 to other schools in Manhattan School District 5

without providing adequate prior notice and a hearing to the parents or guardians of such children. The court's order compelled the Board to provide the transferred students with "those curricular and extra-curricular programs and related services which were available to plaintiff children at P.S. 79." For reasons stated below, we hold that the transfer did not violate the Act and we reverse the order of the district court.

I

The facts of this case may be briefly summarized as follows. In the summer of 1979, the trustees of School District 5 decided to close P.S. 79 for budgetary reasons.[1] Approximately 185 of the 310 students at P.S. 79 were handicapped children enrolled in special education classes, and the Division of Special Education determined that these students should begin the coming school year at their new locations rather than face disruption in the middle of the term. Thus, in late August 1979, the Board endeavored to notify the parents of children attending P.S. 79 that the school was being closed and that the students would be transferred to other schools within the district, with teachers and their classes being kept intact as much as possible. The transfer was marred, however, by several bureaucratic mix-ups, and the Board was not entirely successful in assuring that teachers and their classes remained together.[2]

In November 1979, plaintiffs in this case—a group of handicapped students at P.S. 79, their parents and guardians, and an unincorporated association formed to preserve quality education for the students—filed this action against the Board, alleging that the transfer of handicapped students from P.S. 79 had violated the Due Process clause of the Fourteenth Amendment, the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq., the Rehabilitation Act of 1973, 29 U.S.C. § 794 and various provisions of the New York Education Law. Plaintiffs sought class certification, declaratory relief, and an injunction compelling the return of the plaintiff children to P.S. 79. District Judge Carter enjoined the Board from making structural modifications of P.S. 79 that would prevent the return of plaintiff children to the school should they ultimately prevail on the merits, and promptly held a hearing on plaintiffs' request for class certification and a preliminary injunction. In early February 1980, Judge Carter orally granted plaintiffs' motion for a preliminary injunction; rather than requiring the return of plaintiff students to P.S. 79, however, the district court ordered the Board to provide the students at their new schools with educational programming equivalent to what they received prior to the transfer. On February 27, 1980, the court issued a written opinion which described the "extremely innovative educational program" previously provided to handicapped children at P.S. 79 and detailed the trauma caused by the transfer and the inadequacy of some of the new assignments. The court concluded that the transfer was "made in haste" and "seem[ed] totally at variance with both the letter and the spirit of the federal and state laws designed to provide procedural protection for the handicapped."

On March 31, 1980, the court issued a further, detailed order that held that the transfer constituted a "change in placement" under the Education for All Handicapped Children Act of 1975 (the Act); the order defined a "change in placement" as "any significant alteration in the programs,

---

1. Board officials from School District 5 testified that they had originally hoped to avoid a school closing, and, upon learning of the funding limitations for the 1979-80 school year, immediately sought input from the community on ways to avoid such a closing. Several public meetings were held in May 1979 for this reason. However, it was ultimately determined that the closing of one school was preferable to the drastic reduction of support services at all 21 schools in the district. P.S. 79 was selected apparently because it was underutilized and suffered from a declining enrollment.

2. The most notable error was the transfer of a group of ten to twelve year olds to P.S. 36, which was equipped for only very young children. The Board has since corrected this mistake.

activities, or services provided by defendants to handicapped children . . . . includ[ing] changes in the degree to which handicapped children are integrated with non-handicapped children in these programs and activities, as well as significant changes in curriculum, extra-curricular offerings, class composition and teacher assignments." The court found that the failure of the Board to provide plaintiffs with notice and a hearing prior to the change in placement violated the procedural provisions of the Act, 20 U.S.C. § 1415. To remedy this violation, the order required the Board to provide the transferred students with a broad array of curricular and extra-curricular programs and services that had previously been available at P.S. 79. The order also set forth the procedural steps that the Board would be required to follow before making any further "changes in placement," as well as provisions for monitoring compliance. Finally, the order dissolved the temporary restraining order enjoining structural modifications of P.S. 79 [3] and granted plaintiffs' motion for class certification. Full implementation of the district court's order has been stayed pending disposition of this appeal.

## II

■ On the record before us, it is clear that the transfer of students from P.S. 79 was poorly planned, and that the move was disconcerting to many of the handicapped children that had attended the school. Moreover, as the district court found, the schools to which the students were transferred do not in all respects duplicate the "extremely innovative educational program" formerly provided to handicapped children at P.S 79. However, the issue before us is not whether the Board acted wisely or carried out its decision properly. Instead, the narrow question on this appeal is whether the transfer of handicapped children in special classes at one school to substantially similar classes at other schools within the same school district constitutes a change in "placement" sufficient to trigger the Act's prior notice and hearing requirements.

The primary purpose of the Act is to encourage states, through the use of fiscal incentives, to provide a "free appropriate public education" for all handicapped children. See, e. g., 20 U.S.C. § 1412(1). In furtherance of this goal, the Act also embodies a range of procedures designed to ensure that fundamental decisions concerning the education of handicapped children are made correctly and with appropriate input from the parents or guardians of such children. See generally Note, Enforcing the Right to an "Appropriate" Education: The Education for All Handicapped Children Act of 1975, 92 Harv.L.Rev. 1103 (1979). The interpretation of one such procedural mechanism is at issue here. Pursuant to 20 U.S.C. § 1415(b)(1)(C), whenever an educational agency covered by the Act

> (i) proposes to initiate or *change* or
> (ii) refuses to initiate or change the identification, evaluation, or *educational placement* of the child or the provision of a free appropriate education to the child, (emphasis supplied)

it must provide the parents or guardian of the child with prior written notice. Other subsections of § 1415(b) require the agency to provide parents or guardians in such cases with an opportunity for "an impartial due process hearing." See §§ 1415(b)(1)(D), 1415(b)(2). The statute fails to define "change . . . [in] educational placement." The district court, in concluding that the Board's action violated these procedural requirements, construed the term to encompass the transfer of handicapped students between schools in the same district, as well as any other significant alteration in the curriculum, extra-curricular offerings, support services, class composition, or teacher assignments provided to handicapped children. Although this is a possible reading of the section, we nonetheless believe that the term "educational placement" refers only to the general type of educational program in which the child is placed. So construed, the prior notice and hearing re-

---

**3.** P.S. 79 is now being changed into a special school for children with multiple handicaps.

quirements of § 1415(b) would not be triggered by a decision, such as that made by the Board in this case, to transfer the special education classes at one regular school to other regular schools in the same district.

Several factors support this conclusion. First, in § 1415(b)(1)(C) the term "educational placement" is used in the context of changes in the "identification, evaluation, or educational placement" of the handicapped child. This language suggests that the full notice and hearing requirements of § 1415(b) were limited to certain fundamental decisions regarding the existence and classification of a handicap, and the most appropriate type of educational program for assisting a child with such a handicap. The legislative history of the Act supports this interpretation, for it indicates that a primary concern of Congress in enacting these procedural protections of § 1415(b) was to prevent the erroneous identification or classification of children as handicapped and the impairment of their subsequent education by ensuring that parents would be afforded prior notice and an opportunity to participate in such fundamental determinations. The Senate Report, for example, notes that the Committee on Labor and Public Welfare was "deeply concerned about practices and procedures which result in classifying children as having handicapping conditions when, in fact, they do not have such conditions." S.Rep. No. 94–168, 94th Cong., 1st Sess. 26 (1975), reprinted in [1975] U.S.Code Cong. & Admin.News, pp. 1425, 1450–51. Thus the reference to "educational placement" in § 1415(b)(1)(C) would appear to refer to the general educational program in which a child who is correctly identified as handicapped is enrolled, rather than mere variations in the program itself, which the district court apparently believed could constitute a change in placement.

The regulations implementing the Act also interpret the term "placement" to mean only the general program of education. The Act embodies a statutory preference for "mainstreaming," or the maximum possible integration of handicapped children with nonhandicapped children, 20 U.S.C. § 1412(5)(B), and the regulations implementing this preference provide in pertinent part:

§ 121a.551 Continuum of alternative placements

(a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services.

(b) The continuum required under paragraph (a) of this section must:

(1) Include the alternative placements listed in the definition of special education under § 121a.13 of Subpart A (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions). . . .

45 C.F.R. § 121a.551. Thus, the regulations use the term "placement" to refer only to the general educational programs provided for handicapped children, and the reference to a "change" in "educational placement" in § 1415(b)(1)(C) would therefore apparently encompass only decisions to transfer a child from one type of program to another. For example, a decision to transfer a handicapped child from a special class in a regular school to a special school would involve the sort of fundamental alteration in the child's education requiring prior parental notification under § 1415(b).[4]

4. In support of their position, plaintiffs rely heavily on a policy memorandum issued by the Office of Civil Rights of the Department of Health, Education and Welfare. The memorandum provides:

Issue: A change in the location of a special education program as a "change in educational placement."

Facts: A school district relocated a special education program which necessitated transferring children from one school district to a separate school district.

Decision: In this case, the change in school site does constitute a significant change in the children's educational placement. Ordinarily, a mere change in the physical location will not be a significant change in educational placement, unless there are changes in the nature or quality of the educational services being delivered. The fact that the children in

Finally, strong policy considerations support a restrictive interpretation of the meaning of "educational placement" in § 1415(b)(1)(C). As previously noted, in concluding that the transfer of students from P.S. 79 had violated that section, the district court ordered the Board to make numerous minor alterations and additions in the educational programs of the handicapped children at their new locations. For example, the court ordered the Board to provide the transferred students with, among other things,

(a) A peer tutoring program in which handicapped children shall have the opportunity to tutor non-handicapped children;

(b) The Afro American Caravan Program;

. . . . .

(d) The Young Audience Program;

(e) The World Poets Resource Center;

(f) A science fair;

(g) Choral groups;

(h) Assembly programs in which the handicapped children participate as well as observe;

(i) Dance and art festivals;

(j) A library trip program;

(k) An audio-visual squad;

(*l*) A school book fair;

(m) Weekly radio broadcasts in conjunction with a local radio station;

(n) The President's Physical Fitness Program;

(*o*) Basketball and track teams;

(p) Cheerleading squads;

(q) Boy and Girl Scout troops;

(r) Queens College Teacher Corps Program;

(s) City University student-teacher program;

(t) Flower Fifth Avenue On-Site Developmental Disabilities program;

(u) A fully-equipped resource room;

(v) Title I and Title VI reading programs;

(w) Physical education classes.

While not explicitly stated, it appears that the district court considered the removal of any of the above programs, some of which were privately sponsored rather than provided by the Board, to constitute a change in "educational placement" requiring prior notice and a hearing under § 1415(b). Such an interpretation of the Act would virtually cripple the Board's ability to implement even minor discretionary changes within the educational programs provided for its students; that interpretation would also tend to discourage the Board from introducing new activities or programs or from accepting privately sponsored programs. Further, the educational agency would lack any workable standard for assessing whether a particular contemplated decision might constitute a change in "educational placement." Moreover, given the full hearing required by the section and the right to obtain judicial review of adverse decisions, see § 1415(e)(1), the implementation of such changes could be forestalled indefinitely. More explicit statutory language is required to justify an interpretation that would so constrain the discretion of educational agencies as to when such determinations should be put into effect.[5]

---

this case are being transferred from one school district to another school district is dispositive. Sending handicapped children out of their own school district for their education is a significant change in placement and therefore necessitates the availability of procedural safeguards.

The memorandum, however, provides little guidance as to the application of § 1415(b)(1)(C) to the present case, both because the memorandum is somewhat ambiguous and because it deals only with interdistrict transfers of students. The transfers here were within the school district.

**5.** See also *Brown v. District of Columbia Board of Education*, 3 Educ. of the Handicapped L. Rep. 551:101 :104 (D.D.C.1978), in which the district court rejected a claim that there had been a change in placement requiring prior notice and a hearing, and noted:

The regulations seem to use the term "placement" as a substitute for "program" and the Act appears to contemplate use of the due process mechanism only for changes that affect the form of educational instruction being provided to a handicapped child. Thus the Court is inclined to agree with the defendants that transferring the Deaf-Blind

Thus, we conclude that the term "educational placement" refers only to the general educational program in which the handicapped child is placed and not to all the various adjustments in that program that the educational agency, in the traditional exercise of its discretion, may determine to be necessary. Given this interpretation, we do not believe on the record before us that the transfer of students from P.S 79 constituted a change in placement sufficient to trigger the prior notice and hearing provisions of § 1415(b). The transferred handicapped students remain in the same classification, the same school district, and the same type of educational program—special classes in regular schools. Moreover, although the classes at the new schools may vary in some respects from the somewhat unusual program formerly provided at P.S. 79, there is no suggestion in the record that the Board intended or attempted to alter the placement of any handicapped students by transferring them to other schools within the district. Indeed, the record indicates that the Board, in making the decision to close one school and then planning the transfer of the handicapped students to various other schools in the same school district, made a good faith effort to preserve intact as far as possible the basic educational programs that the transferred children had formerly enjoyed at P.S. 79.[6] Accordingly, we conclude that the Board was not required under the Act to give parents of handicapped children at P.S. 79 prior notice and a full due process hearing before the transfer of such students to other regular schools within the district.

Our conclusion does not mean, however, that there are no constraints on the power of school boards to close schools and transfer students; we merely hold that under the facts of this case § 1415(b) did not act as such a constraint.[7] Nor do we believe that our decision leaves the parents of transferred handicapped students without means under the Act to redress the alleged deficiencies in the educational programs of the children at their new locations. For example, the Act requires that participating educational agencies provide the parent or guardian of a handicapped child with "an opportunity to present complaints with respect to any matter relating to . . . the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(1)(E). The agency is required to address such complaints at a full administrative hearing, and the parent or guardian has a right to judicial review of adverse agency determinations after exhaustion of administrative remedies. 20 U.S.C. § 1415(b)(2)–(e). See also *Harris v. Campbell*, 472 F.Supp. 51 (E.D.Va.1979). These procedural protections provide an adequate means by which the parents of the handicapped children transferred from P.S. 79 can seek to ensure that schools at which the

Class from the Tyler School to the Sharpe Health School was not a change in placement. To find otherwise could extend the notice and hearing requirements of the Act to situations perhaps not contemplated by Congress and impose a procedural mechanism that could severely limit the administrative discretion of local education authorities. For example, if a change in placement were deemed to occur every time a decision was made that affected the educational experience of a handicapped child, a local board could be prevented from implementing changes in personnel, supportive services, or even class size unless they undertook the procedural requirements of notice and hearing.
Id. at 551:103-:104.

6. Moreover, the transfer may actually further the statutory goal of integrating handicapped children into the regular educational process.

See 20 U.S.C. § 1412(5)(B); 45 C.F.R. §§ 121a.550 -52. As previously noted, handicapped children made up approximately two-thirds of the class at P.S. 79; at their new locations, they comprise a minority of the student body. Thus, the transfer, if anything, provides the students formerly attending P.S. 79 with greater opportunities for interaction with nonhandicapped students and for learning to function in a "normal" environment. And while the district court found six months after the transfer that there was inadequate integration of handicapped and nonhandicapped children, we find no indication in the record that this situation is not amenable to change.

7. In this regard, it should be noted that the Board did seek community input when the closing of a school in District 5 appeared likely.

children were relocated provide an appropriate education. See also 45 C.F.R. §§ 121a.343–45 (1978).

Accordingly, we reverse the order of the district court and dissolve the preliminary injunction.